1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN CAVAZOS, on behalf of himself
and all others similarly situated,

Plaintiff,

v.

SALAS CONCRETE INC.,

Defendant.

No.  1:19-cv-00062-DAD-EPG

ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS ACTION
SETTLEMENT AND CONDITIONAL CLASS
CERTIFICATION

(Doc. No. 45)

This matter is before the court on plaintiff's motion for preliminary approval of a class
action settlement and conditional certification of settlement class filed on January 6, 2021.  (Doc.
No. 45.)  Pursuant to General Order No. 617 addressing the public health emergency posed by the
COVID-19 pandemic, plaintiff's motion was taken under submission on the papers.  (Doc. No.
46.)  For the reasons explained below, the court will now grant preliminary approval of the
proposed settlement and conditional certification of the settlement class.[1]

---

[1] The undersigned apologizes for the excessive delay in the issuance of this order.  This court's
overwhelming caseload has been well publicized and the long-standing lack of judicial resources
in this district long-ago reached crisis proportion.  That situation has now been partially addressed
by the U.S. Senate's confirmation of a new district judge for this court on December 17, 2021.
Nonetheless, for over twenty-two months the undersigned was left presiding over approximately
1,300 civil cases and criminal matters involving 735 defendants.  Unfortunately, that situation
sometimes results in the court not being able to issue orders in submitted civil matters within an
acceptable period of time.  This has been frustrating to the court, which fully realizes how
incredibly frustrating it is to the parties and their counsel.

## BACKGROUND

Defendant Salas Concrete, Inc. is a "licensed concrete contractor that provides a wide range of concrete services, including, but not limited to, supplying, forming, reinforcing, pouring, finishing, and resurfacing concrete." (Doc. No. 45-1 at 13.) Plaintiff John Cavazos was employed by defendant as an hourly, non-exempt employee from 2011 until 2018. (*Id.* at 13, 15.)

Plaintiff originally filed this class, collective, and representative action in this court on January 14, 2019. (*Id.* at 13.) Plaintiff filed a first amended complaint on March 27, 2019 (Doc. No. 8), alleging various wage, hour, and other labor-related claims in violation of the California Labor Code, California Business and Professions Code, and federal Fair Labor Standards Act ("FLSA"), which plaintiff claims give rise to penalties under California's Private Attorney's General Act ("PAGA"). (*Id.* at 13–14.) Defendant answered on April 22, 2019, denying that it violated any relevant California or federal laws. (Doc. No. 14.) Thereafter, the parties engaged in "informal discovery," whereby they exchanged "data, information, and documents," and defendant produced "time-keeping records, time and payroll data for putative class members." (Doc. No. 45-1 at 14.) The parties then entered into private mediation before the Honorable Steven M. Vartabedian (Ret.) on November 6, 2019. (*Id.*)

On March 20, 2020, plaintiff filed a motion for conditional certification and preliminary approval of the class and collective action settlement. (Doc. No. 27.) After a hearing on the motion before Magistrate Judge Erica P. Grosjean, findings and recommendations were issued on July 21, 2020 recommending that the motion for conditional certification and preliminary approval of the class and collective action settlement be granted. (Doc. Nos. 30, 31.) Thereafter, the undersigned identified several issues of concern regarding the proposed settlement and directed the parties to submit responsive supplemental briefing. (Doc. No. 33.) On September 28, 2020, the court declined to adopt the findings and recommendations and denied plaintiff's motion for conditional certification and preliminary approval of the class and class action settlement. (Doc. No. 37.) Subsequently, the court directed the parties to file a new motion for preliminary approval of class action settlement. (Doc. No. 41.) On January 6, 2021, plaintiff

/////

2

1    filed the now pending motion for conditional certification and preliminary approval of the class

2    and collective action settlement.[2]  (Doc. No. 45.)

3                              **THE PROPOSED SETTLEMENT**

4    **A.      The Class**

5           For settlement purposes, the parties request approval of the following class (the "Class")

6    of an estimated 39–40 individuals (the "Class Members" or "Settlement Class"):  "all current and

7    former California hourly, non-exempt employees Salas Concrete, Inc. employed during the Class

8    Period."  (Doc. No. 45-2 at 37.)

9    **B.      The FLSA Collective**

10          In his pending motion, plaintiff refers to the Class Members as being similarly situated to

11   plaintiff for the purposes of FLSA Conditional Certification.  (Doc. No. 45-1 at 29.)  However,

12   plaintiff does not specify a collective in the terms of the Settlement Agreement.  Nonetheless, the

13   court will preliminarily approve the following collective (the "FLSA Collective" or "FLSA

14   Members"), which shares the same definition as that of the Class Members:  "all current and

15   former California hourly, non-exempt employees Salas Concrete, Inc. employed during the Class

16   Period."[3]  (Doc. No. 45-2 at 37.)

17   **C.      The Settlement Period**

18          For settlement purposes, plaintiff has defined the "Class Period" as the time period of

19   "January 14, 2015 through November 6, 2019."  (Doc. No. 45-2 at 38.)

20   /////

21

22   [2]  On January 5, 2021, the parties filed a stipulation requesting a seventeen (17) page extension of
     the twenty-five (25) page limit applicable to plaintiff's motion for conditional certification and
23   preliminary approval of the class and collective action settlement.  (Doc. No. 44); Standing Order
     § 1.B.  The parties contend that such an extension is appropriate to allow them to "fully address
24   the Court's concerns relating to Plaintiff's first motion for preliminary approval of class action
     settlement."  (*Id.* at 2; *see also* Doc. Nos. 33, 37).  Good cause appearing, the court hereby grants
25   the parties' request to extend the applicable page limit by no more than seventeen (17) pages.
     (Doc. No. 44.)
26

27   [3]  In his motion for final approval, plaintiff is directed to specify the exact definition of the FLSA
     Collective, if the parties' intended definition of the collective differs from the court-provided
28   definition above.

                                             3

**D.     The Release of Claims**

The settlement agreement defines the Released Parties as:

> Defendant Salas Concrete, Inc. and its present and former parent companies, subsidiaries, divisions, affiliates, related companies, joint ventures, and each of their respective present and former officers, directors, shareholders, agents, employees, insurers, attorneys, payroll companies, accountants, auditors, advisors, representatives, consultants, pension and welfare benefit plans, plan fiduciaries, administrators, trustees, general and limited partners, predecessors, successors and assigns.

(*Id.* at 42.)

The Released Class Claims are defined as:

> [A]ny and all claims, demands, rights, debts, obligations, costs, expenses, wages, liquidated damages, statutory damages, penalties including civil and statutory, liabilities, and/or causes of action of any nature and description whatsoever, whether known or unknown, at law or in equity, whether concealed or hidden, whether under federal, state, and/or local law, statute, ordinance, regulation, common law, or other source of law, which were asserted in the Action against the Released Parties arising out of the facts and circumstances alleged in the First Amended Complaint during the Release Period.  Released claims include, without limitation, claims arising under federal, state, and/or local statutory, constitutional, contractual, or common law claims for wages, damages, costs, penalties, liquidated damages, punitive damages, interest, attorney fees, litigation costs, restitution, equitable relief, or other relief under California Business & Processions Code Section 17200 et seq. ("Section 17200") based on the California Labor Code; the Wage Orders of the California Industrial Welfare Commission; and Section 17200, including, but not limited to, failure to provide timely, off-duty meal and/or rest breaks; failure to promptly pay all wages due and owing at the time of the employee's separation from employment; failure to reimburse for expenses; engaging in unlawful/unfair/fraudulent business practices in violation of Section 17200; failure to provide accurate itemized wage statements; failure to keep accurate payroll records; failure to pay the California or federal minimum wage; failure to pay California or federal overtime; and any and all California Labor Code provision[s] giving rise to PAGA penalties.

(*Id.* at 41–42.)

The Released FLSA Claims are defined as:

> [A]ny related Fair Labor Standards Act ("FLSA") wage claims, whether known or unknown, arising for any Settlement Class Member, based on those allegations in the Action but only for those Settlement Class Members who endorse their FLSA Settlement Checks . . . by signing under the pre-printed language under each

4

> Settlement check:   "By signing, endorsing, depositing, cashing, and/or negotiating this check, I hereby 'opt in' to the Settlement and release all claims pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b) *et seq.*"   Settlement Class Members will release the FLSA claim only if they opt in by cashing, depositing, or otherwise negotiating their FLSA Settlement Checks.

(*Id*.)

The release of claims extends from claims arising from January 14, 2015 through April 1, 2020.  (Doc. No. 45-2 at 38.)  In addition, the Settlement Agreement clarifies the scope of the Released Claims as follows:

> It is understood and agreed that the stipulation will not release any person, party or entity from claims, if any, by Settlement Class Members for workers compensation, unemployment, or disability benefits of any nature.  However, it is understood and agreed that any and all claims for penalties of any kind, including civil or statutory penalties with respect to any and all wages of any nature are released.

(*Id.* at 41–42.)

**E.      Summary of the Settlement Terms**

Under the proposed settlement, defendants will pay a total of $175,000.00 (the "Gross Settlement Fund") allocated as follows:  1) up to $58,333.00 for attorneys' fees and up to $15,000 for plaintiff's counsel's documented litigation costs; (2) a $10,000 incentive award for plaintiff; (3) $4,000 in civil PAGA penalties, with $3,000 of the penalties payable to the California Labor and Workforce Development Agency ("LWDA")[4]; and (4) up to $5,000 for settlement administration costs.  (Doc. No. 45-2 at 46-47, 49.)  Defendant is responsible for paying any applicable payroll taxes "separate and apart" from the $175,000 deposit to the Gross Settlement Fund.  (Doc. No. 45-2 at 40.)

Assuming these allocations are awarded in full, approximately $83,666.00 (the "Net Settlement Fund") will be available for distribution to Class Members who do not submit a timely and valid request for exclusion ("Participating Class Members") and FLSA Members who timely

---

[4]  Pursuant to the PAGA, 75% of the civil PAGA penalties, or $3,000, will go to the LWDA, and 25%, or $1,000, will be allocated to the Net Class Settlement Fund.  (Doc. No. 45-2 at 50).  *See* Cal. Lab. Code § 2699(i).

and validly opt-in to the FLSA Collective ("Participating FLSA Members").[5]  (Doc. No. 45-2 at 40.)  From the Net Settlement Fund, 90% will be allocated to the Class Settlement ("Net Class Settlement") and 10% to the FLSA Settlement ("Net FLSA Settlement Fund").  (*Id.* at 55.)  The Net Class and Net FLSA Settlement Funds will be distributed to their respective members on a *pro rata* basis based on the number of pay periods worked by the applicable Participating Class and FLSA Members while employed by defendant during the Class period.  (*Id.* at 54–55.)  Plaintiff estimates that Participating Class and FLSA Members will receive an average total payment of $2,145.30.[6]  (*Id.* at 40.)  Checks that are not cashed before their expiration will be canceled, with the funds to instead be transmitted to the California State Controller's Unclaimed Property Fund.  (*Id.* at 57.)[7]  If more than twenty percent of the Class Members timely opt-out of receiving a settlement check, defendant retains the exclusive right to void the settlement before the final approval hearing.  (*Id.* at 58.)  If more than twenty percent of Class Members timely opt-out and defendant voids the settlement, then the settlement and conditional class certification are considered void, and "the Parties shall stand in the same position, without prejudice, as if this [settlement agreement] had neither been entered into nor filed with the Court."[8]  (*Id.*)

/////

---

[5]  In order to opt-in, FLSA Members must cash their settlement checks with the following language written on the check:  "By signing, endorsing, depositing, cashing, and/or negotiating this check, I hereby 'opt in' to the Settlement and release all claims pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b) *et seq.*"  (Doc. Nos. 45-2 at 41–42; 45-1 at 18.)

[6]  Each Class Member's payment amount will be decreased by "any Taxes and Required Withholdings."  (Doc. No. 45-2 at 40.)

[7]  Each Class Member must cash their checks within 180 days after they are mailed to the Class Member.  (Doc. No. 45-2 at 57.)  If a check is returned to the Settlement Administrator, the Settlement Administrator will "make all reasonable efforts to re-mail" the check to the correct address.  (*Id.*)  If the check is not cashed within 180 days of being re-mailed, the Settlement Administrator will send the Class Member a letter stating that "unless the check(s) is cashed within 30 days of the date of the letter, it will expire and become non-negotiable and offering to replace the check if it was lost or misplaced, but not cashed."  (*Id.*)

[8]  The court previously expressed concern over this provision and directed the parties to provide authority for their proposition that defendant's right to void the settlement is reasonable, fair, and adequate under Rule 23.  (Doc. No. 33 at 5–6.)  The court addresses the parties' response to the court's instructions later in this order.

Defendant will not deposit the entire Gross Settlement Fund at one time.  (*Id.* at 50.)

Rather, within ninety days of the settlement becoming effective, defendant will deposit one-seventh of the Gross Settlement Fund and one-seventh of its employer-side payroll taxes with the Settlement Administrator.  (*Id.*)  Thereafter, defendant will continue to deposit one-seventh of the Gross Settlement Fund and the employer-side payroll taxes with the Settlement Administrator every 180 days, until the entirety of the Gross Settlement Fund amount and payroll taxes have been paid 39 months after the settlement becomes effective.  (*Id.*)  Participating Class Members and Participating FLSA Members will not receive their checks until twenty-eight days after defendant has deposited all funds with the Settlement Administrator.  (*Id.* at 56.)  While unusual, plaintiff's counsel asserts that this payment plan is motivated by defendant's "financial distress," since defendant's only assets are "items of low-value," and neither the defendant nor its sole shareholder, Robert Salas, own "any real property or [have] any significant cash reserves."  (Doc. No. 45-2 at 12–13.)  According to Robert Salas's declaration, "[a]fter a review of Salas Concrete's financials, the mediator and Plaintiff's counsel agreed that any settlement would have to be greatly reduced with any settlement payments to be made over time. . . . Without a settlement payment plan . . . no settlement would have been reached."  (Doc. No. 45-5 at ¶¶ 5–6.)  If defendant defaults on the payment plan and is unable to complete all seven payments, at plaintiff's option, the already-deposited amounts in the Gross Settlement Fund may be distributed pro rata.[9]  (Doc. No. 45-2 at 50.)  The release of Released Claims and Released FLSA Claims will not take effect until defendant pays the entire Gross Settlement Amount and its employer-side payroll taxes.  (*Id.*)

/////

/////

/////

---

[9]  It is unclear what will happen to the already-deposited funds in the event defendant defaults, is unable to make all seven payments, and plaintiff does *not* exercise his option to have the already-deposited amounts distributed *pro rata*.  Plaintiff is directed to clarify this information in his motion for final approval and provide authority in support of his apparent position that such an outcome would be fair, adequate, and reasonable in this case.

1

**LEGAL STANDARD**

2

**A.     Rule 23 Settlements**

3          Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a

4    certified class—or a class proposed to be certified for purposes of settlement—may be settled,

5    voluntarily dismissed, or compromised only with the court's approval."  The following

6    procedures apply to the court's review of the settlement proposal.  First, "[t]he court must direct

7    notice to all class members who would be bound by the proposal," if the parties show that "the

8    court will likely be able to:  (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class

9    for purposes of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1).  Second, "[i]f the proposal

10   would bind class members, the court may approve it only after a hearing and only on finding that

11   it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In doing so, the court must

12   consider whether:  "the class representatives and class counsel have adequately represented the

13   class"; "the proposal was negotiated at arm's length"; "the relief provided for the class is

14   adequate"; and "the proposal treats class members equitably relative to each other."  *Id.*  When

15   considering whether "the relief provided for the class is adequate," the court should also take into

16   account:

17                    (i)     the costs, risks, and delay of trial and appeal;

18                    (ii)    the effectiveness of any proposed method of distributing
                             relief to the class, including the method of processing class-
19                           member claims;

20                    (iii)   the terms of any proposed award of attorney's fees, including
                             timing of payment; and
21
                      (iv)    any agreement required to be identified under Rule 23(e)(3).
22

23   *Id.*  Third, and finally, Rule 23 provides additional procedural requirements:  "[t]he parties

24   seeking approval must file a statement identifying any agreement made in connection with the

25   proposal"; "[a]ny class member may object to the proposal if it requires court approval under this

26   subdivision (e)"; and "[u]nless approved by the court after a hearing, no payment or other

27   consideration may be provided in connection with:  (i) forgoing or withdrawing an objection, or

28   /////

(ii) forgoing, dismissing, or abandoning an appeal from a judgment approval the proposal." Fed. R. Civ. P. 23(e)(3), (5).

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted).  To protect the rights of absent class members, Rule 23(e) requires that the court approve class action settlements "only after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate." *Id.* at 946.  When parties seek approval of a settlement agreement negotiated before formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Id.*  In such circumstances, the "settlement approval requires a higher standard of fairness" and a "more exacting review" so as "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks and citations omitted).  Rule 23 "demand[s] undiluted, even heightened, attention" to the certification requirements when class certification is sought only for purposes of settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Accordingly, the district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing. *See, e.g.*, *Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

Review of a proposed class action settlement ordinarily proceeds in three stages. *See* David F. Herr, *Ann. Manual Complex Lit.* § 21.632 (4th ed.).  First, the court conducts a preliminary fairness evaluation and, if applicable, considers class certification. *Id.*  If the parties move for both class certification and preliminary approval, the certification hearing and preliminary fairness evaluation can usually be combined. *Id.*  Second, if the court makes a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms, the parties are directed to prepare and issue the notice of certification and proposed settlement to the class members. *Id.*  Third, the court holds a final fairness hearing to determine whether to /////

1  approve the settlement.  *Id.*; *see Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1267

2  (9th Cir. 2010).

3       Federal Rule of Civil Procedure 23(e)(1) provides that preliminary approval is

4  appropriate—and notice to class members may be sent—when it is "likely" the court will be able

5  to:  (1) grant final approval under Rule 23(e)(2); and (2) certify the class for purposes of judgment

6  on the proposal.  Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint Gov't Sols. Inc.*, No. 12-

7  cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware*

8  *Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting that federal courts

9  generally grant preliminary approval if "the proposed settlement appears to be the product of

10  serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly

11  grant preferential treatment to class representatives or segments of the class, and falls within the

12  range of possible approval").  Although the court need not "reach any ultimate conclusions on the

13  contested issues of fact and law which underlie the merits of the dispute," a court should weigh,

14  among other factors:  the strength of a plaintiff's case; the risk, expense, complexity, and likely

15  duration of further litigation; the extent of discovery completed; and the value of the settlement

16  offer.  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964–967 (9th Cir. 2009) (quoting *Officers for*

17  *Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)).

18  **B.      FLSA Settlements**

19       The FLSA permits employees to file civil actions against employers who abridge the

20  FLSA's guarantees.  29 U.S.C. § 216(b); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S.

21  66, 69 (2013) ("The FLSA establishes federal minimum-wage, maximum-hour, and overtime

22  guarantees that cannot be modified by contract.").  Employees may bring collective actions under

23  the FLSA, representing all "similarly situated" employees, but "each employee [must] opt-in to

24  the suit by filing a consent to sue with the district court."  *Does I thru XXIII v. Advanced Textile*

25  *Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000).  Because an employee cannot waive claims under the

26  FLSA, the claims may not be settled without court approval or Department of Labor supervision.

27  *Beidleman v. City of Modesto*, No. 1:16-cv-01100-DAD-SKO, 2018 WL 1305713, at *1 (E.D.

28  Cal. Mar. 13, 2018) (citing *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981)).

1   The decision to certify a FLSA collective action is within the discretion of the district court.  *See*

2   *Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 989 (C.D. Cal. 2006).

3          Although the Ninth Circuit has not established criteria to evaluate FLSA settlements,

4   district courts in this circuit routinely apply the standard employed in the Eleventh Circuit, which

5   examines whether a settlement is a fair and reasonable resolution of a bona fide dispute.  *See, e.g.*,

6   *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016) (citing

7   *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–53 (11th Cir. 1982)); *Nen Thio v.*

8   *Genji, LLC*, 14 F. Supp. 3d 1324, 1333 (N.D. Cal. 2014) (same).  "A bona fide dispute exists

9   when there are legitimate questions about the existence and extent of defendant's FLSA liability."

10  *Kerzich v. Cnty. of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018) (citation omitted).  A

11  court will not approve a settlement when there is certainty that the FLSA entitles plaintiffs to the

12  compensation they seek because doing so would shield employers from the full cost of complying

13  with the statute.  *Id.*

14         If a bona fide dispute between the parties exists, "[c]ourts often apply the Rule 23 factors

15  in evaluating the fairness of an FLSA settlement, while recognizing that some do not apply

16  because of the inherent differences between class actions and FLSA actions."  *Khanna v. Inter-*

17  *Con Sec. Sys., Inc.*, No. 2:09-cv-02214-KJM-EFB, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22,

18  2013) (internal quotation marks and citations omitted).  The factors include

19              the strength of the plaintiffs' case; the risk, expense, complexity, and
                likely duration of further litigation; the risk of maintaining class
20              action status throughout the trial; the amount offered in settlement;
                the extent of discovery completed and the stage of the proceedings;
21              the experience and views of counsel; the presence of a governmental
                participant; and the reaction of the class members to the proposed
22              settlement.

23  *Khanna v. Intercon Sec. Sys., Inc.*, No. 2:09-cv-2214-KJM-EFB, 2014 WL 1379861, at *6 (E.D.

24  Cal. Apr. 8, 2014), *order corrected*, 2015 WL 925707 (E.D. Cal. Mar. 3, 2015) (quoting *Hanlon*

25  *v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*

26  *Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

27         District courts in this circuit have also taken note of the "unique importance of the

28  substantive labor rights involved" in settling FLSA actions and adopted a "totality of

1  circumstances approach that emphasizes the context of the case." *Selk*, 159 F. Supp. 3d at 1173.

2  Under this approach, a "district court must ultimately be satisfied that the settlement's overall

3  effect is to vindicate, rather than frustrate, the purposes of the FLSA." *Id.*  In connection with this

4  approach, the district court's "obligation is not to act as caretaker but as gatekeeper, so that FLSA

5  settlements do not undermine the Act's purposes." *Kerzich*, 335 F. Supp. 3d at 1185 (citation

6  omitted).  Thus, only settlements that reflect a fair and reasonable compromise of issues actually

7  in dispute may be approved by the court.  *Id.* (citation omitted).

8  **C.     PAGA Settlements**

9          Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor

10  code violations on behalf of herself and other current or former employees.  Cal. Lab. Code

11  § 2699(a).[10]  A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law

12  enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).  Thus, a judgment

13  in a PAGA action "binds all those, including nonparty aggrieved employees, who would be

14  bound by a judgment in an action brought by the government." *Id.*

15          The PAGA statute imposes several limits on litigants.  First, because a PAGA action

16  functions as a "substitute" for an action brought by the state government, a plaintiff suing under

17  PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages

18  available privately through direct or class action claims. *Iskanian*, 59 Cal. 4th at 381; *ZB, N.A. v.*

19  *Superior Court*, 8 Cal. 5th 175, 182, 193 (2019).  Second, to bring an action under PAGA, an

20  aggrieved employee must first provide written notice to the LWDA as well as to the employer.

21  Cal. Lab. Code § 2699.3(a)(1).  Third, any civil penalties recovered must be divided 75% with the

22  LWDA and 25% with the aggrieved employees. *Id.* § 2699(i).  Fourth, and finally, the proposed

23  settlement must be submitted to the LWDA, and a trial court must "review and approve" any

24  settlement of PAGA claims. *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*,

25  383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (citation omitted) (noting that because settling a

26

27  [10]  An "aggrieved employee" is defined as "any person who was employed by the alleged violator
    and against whom one or more of the alleged violations was committed."  Cal. Lab. Code
28  § 2699(c).

1    PAGA claim "compromises a claim that could otherwise be brought be the state," it requires that

2    a court "review and approve any settlement of any civil action pursuant to [PAGA]").

3           Although there is no binding authority setting forth the proper standard of review for

4    PAGA settlements, California district courts "have applied a Rule 23-like standard, asking

5    whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in

6    light of PAGA's policies and purposes.'" *Haralson*, 383 F. Supp. 3d at 972.  This standard is

7    derived principally from the LWDA itself.  In commenting on a proposed settlement including

8    both class action and PAGA claims, the LWDA offered the following guidance:

9              It is thus important that when a PAGA claim is settled, the relief
              provided for under the PAGA be genuine and meaningful, consistent
10            with the underlying purpose of the statute to benefit the public and,
              in the context of a class action, the court evaluate whether the
11            settlement meets the standards of being "fundamentally fair,
              reasonable, and adequate" with reference to the public policies
12            underlying the PAGA.

13   *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's

14   guidance with approval).[11]  Recognizing the distinct issues presented by class actions, this court is

15   persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in

16   evaluating the PAGA portion of the settlement now before the court.  *See, e.g.*, *Castro v. Paragon

17   Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020);

18   *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May

19   8, 2019).  Accordingly, the court will approve a settlement of PAGA claims upon a showing that

20   the settlement terms (1) meet the statutory requirements set forth by PAGA; and (2) are

21   fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals.

22          When a proposed settlement involves overlapping class action and PAGA claims, courts

23   may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair,

24   reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*,

25   201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*);

26   _____

27   [11]  The LWDA also stated that it "is not aware of any existing case law establishing a specific
     benchmark for PAGA settlements, either on their own terms or in relation to the recovery on
     other claims in the action."  *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal.
28   Jul. 29, 2016) (Doc. No. 736 at 2–3).

*McClure v. Brand Energy Serv., LLC*, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10 (E.D. Cal. May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL 5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Connor* explained:

> For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled. By providing fair compensation to the class members as employees and substantial monetary relief, a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA. Likewise, if the settlement resolves the important question of the status of workers as employees entitled to the protection of the Labor Code or contained substantial injunctive relief, this would support PAGA's interest in "augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance."

*Id.* at 1134–1135 (quoting the LWDA's guidance).  At the same time, where "the compensation to the class amounts is relatively modest when compared to the verdict value, the non-monetary relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers' rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate PAGA."  *Id.* at 1135.  Finally, "where plaintiffs bring a PAGA representative claim, they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment."  *Id.* at 1134.  Plaintiff's special responsibility to other aggrieved workers is especially significant because "PAGA does not require class action procedures, such as notice and opt-out rights."  *Id.*  Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class.

*Id.*

/////

/////

/////

14

1

**ANALYSIS**

2

**A.      Preliminary Class Certification**

3

    1.      Rule 23(a) Requirements

4

       The class action is a procedural mechanism whereby the "usual rule that litigation be

5

conducted by and on behalf of the named parties only" is swept aside so that multiple parties—

6

unwieldy in number but possessing similar or identical claims—may pursue common redress in

7

an efficient and economical manner. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (citation

8

omitted). Here, the parties seek preliminary certification of the proposed class under Federal

9

Rule of Civil Procedure 23, which controls class certification and imposes a two-step process in

10

deciding whether a class may be certified.

11

       First, Rule 23(a) requires the moving party to demonstrate the existence of four

12

prerequisites: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *See Lozano v.*

13

*AT&T Wireless Services, Inc.*, 504 F.3d 718, 730 (9th Cir. 2007). If, and only if, a putative class

14

satisfies these four requirements may it then proceed to show it also satisfies the requirements of

15

Rule 23(b). The party seeking class certification bears the burden of establishing conformity with

16

these two rules and must do so by producing facts "affirmatively demonstrat[ing]" that

17

certification is warranted. *Comcast*, 569 U.S. at 33. Only after conducting a "rigorous analysis"

18

of these facts and determining they show "actual, [and] not presumed, conformance" with Rule

19

23(a) and (b), may a district court certify a class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

20

981 (9th Cir. 2011) (citation omitted); *see also Patel v. Nike Retail Servs., Inc.*, Case No. 14-cv-

21

4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies

22

both to Rule 23(a) and Rule 23(b)."). If a court decides to certify a class, it must define the class

23

claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g).

24

        a.      *Numerosity*

25

       A proposed class must be "so numerous that joinder of all members is impracticable."

26

Fed. R. Civ. P. 23(a)(1). The numerosity requirement demands "examination of the specific facts

27

of each case and imposes no absolute limitations." *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S.

28

318, 330 (1980). Although courts have found that a class of 40 individuals is sufficient under

1    Rule 23, this metric is not a bright line requirement.  *Rannis v. Recchia*, 380 Fed. Appx. 646, 651

2    (9th Cir. 2010) ("The numerosity requirement is not tied to any fixed numerical threshold . . . . In

3    general, courts find the numerosity requirement satisfied when a class includes at least 40

4    members.").[12]  Courts have found the numerosity requirement satisfied when the class comprises

5    as few as thirty-nine members or where joining all class members would serve only to impose

6    financial burdens and clog the court's docket.  *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D.

7    468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity

8    and listing cases).  Here, plaintiffs estimate that there are approximately 39–40 members in the

9    settlement class.  (Doc. Nos. 45-1 at 14–15, 24; Doc. No. 45-2 at 44.)  Plaintiff argues that it

10   would be "impracticable and economically inefficient to requires each Class Member to

11   separately maintain an individual action or be joined as a named plaintiff in this action."  (Doc.

12   No. 45-1 at 23.)  Given this court's voluminous docket,[13] the proximity of a 39-member class to a

13   40-member class, and defendant's "financial distress"—which caused defendant to "convincingly

14   promise[] to seek bankruptcy protection and shut down the business if the litigation continued"—

15   the court finds that joinder of all members would be impractical, and plaintiff's showing with

16   respect to numerosity is adequate to meet the requirements of Rule 23(a)(1).  (Doc. No. 45-1 at

17   31–32.)

18                    b.    *Commonality*

19          Rule 23(a) also requires "questions of law or fact common to the class."  Fed. R. Civ. P.

20   23(a)(2).  To satisfy the commonality requirement, the class representatives must demonstrate

21   that common points of facts and law will drive or resolve the litigation.  *See Wal-Mart Stores,*

22   *Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "[C]ommonality requires that the class members' claims

---

[12]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

[13]  "[T]he court's need to efficiently manage its docket cannot be overstated. This court has 'one of the heaviest caseloads in the nation,' and due to unfilled judicial vacancies, which has been further exacerbated by the COVID-19 pandemic, operates under a declared judicial emergency." *Smart v. Narrow*, 1:20-cv-00144-NONE-HBK, 2021 WL 5414286, at *1 (E.D. Cal. Nov. 19, 2021) (quoting Amended Standing Order in Light of Ongoing Judicial Emergency in the Eastern District of California).

depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350).  For example, "[c]ommonality is generally satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Benitez v. W. Milling, LLC*, No. 1:18-cv-01484-SKO, 2020 WL 309200, at *5 (E.D. Cal. Jan. 21, 2020) (internal quotation marks and citations omitted).

The rule does not require all questions of law or fact to be common to every single class member and "[d]issimilarities among class members do not [necessarily] impede the generation of common answers to those questions[.]" *Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014); *see also Hanlon*, 150 F.3d at 1019 (noting that commonality can be found through "[t]he existence of shared legal issues with divergent factual predicates").  However, the raising of merely any common question does not suffice.  *See Wal-Mart*, 564 U.S. at 349 ("Any competently crafted class complaint literally raises common 'questions.'") (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–32 (2009)).

Here, plaintiff argues that all Class Members were "subject to the same or similar operations and employment policies, practices, and procedures."  (Doc. No. 45-1 at 24.)  Specifically, plaintiff contends that the claims in this case

> arise from the Defendant's alleged uniform policy of failing to properly account for all time worked and failing to provide off-duty meal and rest periods, failing to pay minimum and overtime wages, failing to provide accurate written wage statements, failing to reimburse for expenses, and failing to timely pay all final wages.

(*Id.*)  According to plaintiff, the common questions of law and fact present in this case include:

> (1) Whether Defendant failed to pay minimum and overtime wages to the Class; (2) Whether Defendant failed to provide the Class with all meal and rest periods, and failed to pay the required premiums for workdays with unprovided meal and rest periods under the Wage Order §§ 11 and 12 and Labor Code § 512; (3) Whether Defendant

17

1       failed to pay the Class for all hours worked at the correct rates; (4)
Whether Defendant knowingly and intentionally failed to provide the

2       Class with accurate wage statements under Lab. Code. §§ 226; (5)
Whether Defendant failed to indemnify and reimburse the Class for

3       expenses, including mobile phone and travel expenses, under Labor
Code § 2802.

4

5   (*Id.*)

6        Because the above allegations and questions "would form the basis of each of the

7  plaintiff's claims," the court finds that the commonality requirement is satisfied here. *See Bykov*

8  *v. DC Transp. Servs.*, Inc., No. 2:18-cv-1691-DB, 2019 WL 1430984, at *3 (E.D. Cal. Mar. 29,

9  2019) (citation omitted).

10              c.    *Typicality*

11        "The typicality requirement looks to whether the claims of the class representatives are

12  typical of those of the class and is satisfied when each class member's claim arises from the same

13  course of events, and each class member makes similar legal arguments to prove the defendant's

14  liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citations and internal

15  quotation marks omitted); Fed. R. Civ. P. 23(a)(3). While representative claims must be

16  "reasonably co-extensive with those of absent class members," they "need not be substantially

17  identical." *Hanlon*, 150 F.3d at 1020; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508

18  (9th Cir. 1992).

19        Here, plaintiff states that he was "not compensated for overtime work, was not provided

20  off duty meal and rest periods, and was not reimbursed for use of personal phone and travel

21  expenses." (Doc. No. 45-1 at 25.) To that end, he argues that "resolving the common questions

22  as they apply to Plaintiff will determine Defendant's *prima facie* liability to all the Class

23  Members." (*Id.*)

24        Because the proposed class consists of hourly, non-exempt employees who, like plaintiff,

25  were employed by defendant in California and were allegedly subjected to "the same relevant

26  policies and procedures governing . . . compensation, hours of work and meal and rest periods"

27  (*id.*), the court finds that plaintiff's claims are "reasonably co-extensive with those of absent class

28  members." *Hanlon*, 150 F.3d at 1020. Thus, the typicality requirement is satisfied.

1        d.      *Adequacy of Representation*

2        The final Rule 23(a) prerequisite is satisfied if "the representative parties will fairly and

3    adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Resolution of this issue

4    requires the court to address the following questions:  "(a) do the named plaintiffs and their

5    counsel have any conflicts of interest with other class members and (b) will the named plaintiffs

6    and their counsel prosecute the action vigorously on behalf of the class?"  *Sali v. Corona Reg'l*

7    *Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1651 (2019) (citation

8    omitted); *see also Pierce v. County. of Orange*, 526 F.3d 1190, 1202 (9th Cir. 2008).  "Adequacy

9    of representation also depends on the qualifications of counsel."  *Sali*, 909 F.3d at 1007 (citation

10   omitted).

11       Plaintiff contends that the adequacy of representation requirement is met here because

12   "Plaintiff and the Class Members have strong and co-extensive interests in this litigation"; "there

13   is no evidence of any conflict of interest between Plaintiff and the Class Members"; and "Plaintiff

14   has demonstrated his commitment to the Class by . . . retaining experienced counsel, providing

15   counsel with documents and extensively speaking with them . . . assisting [counsel] in contacting

16   Class Members . . . and exposing himself to the risk of attorneys' fees and costs awards."  (Doc.

17   No. 45-1 at 26.)  Based on these assertions and the above description of plaintiff's claims, the

18   court is satisfied that plaintiff's interests align with those of the proposed Class Members and that

19   plaintiff will vigorously prosecute the action on behalf of the class.

20       Plaintiff's counsel also submitted declarations to establish their adequacy as class counsel.

21   (Doc. Nos. 45-2, 45-3.)  Attorney David Spivak of the firm Spivak Law has practiced law since

22   1995, "almost exclusively in the area of employment law," and is a member of the California

23   Employment Lawyers Association.  (Doc. No. 45-2 at 6.)  He has litigated several cases in both

24   federal and state court, including wage and hour class actions and at least one action under PAGA

25   involving unpaid overtime, unprovided rest and meal periods, and unreimbursed expenses.  (*Id.* at

26   6–7.)  In addition, attorney Spivak states that class counsel does not have any conflicts of interest

27   with the putative class members.  (*Id.* at 6.)

28   /////

Another of plaintiff's counsel, Walter Haines of United Employees Law Group, has also submitted a declaration in support of the pending motion.  (Doc. No. 45-3.)  Attorney Haines asserts that he is "highly experienced in class and representative action litigation" and has been practicing law for over 40 years.  (*Id.* at ¶ 3.)  According to his declaration, he has represented over 1,500 clients in wage and hour disputes, including more than 300 class action cases.  (*Id.*)  Attorney Haines also avers that he has no conflicts of interest with plaintiff or any of the Class Members and that he will "continue to vigorously represent the interests of the class."  (*Id.* at ¶ 13.)

Because plaintiff and class counsel represent that there are no conflicts of interest with the Class Members and class counsel appears to be experienced and vigorous counsel, the court finds that the adequacy of representation requirement has been preliminarily satisfied.

### 2.    Rule 23(b)(3) Requirements

The parties seek class certification under Rule 23(b)(3), which requires that:  (1) the questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action be superior to other available methods for fairly and efficiently adjudicating the controversy.  *See Amchem*, 521 U.S. at 615; *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539, 556 (9th Cir. 2019) (*en banc*).  The test of Rule 23(b)(3) is "far more demanding" than that of Rule 23(a).  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).

### a.    *Predominance*

First, common questions must "predominate" over any individual questions.  While this requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is higher at this stage of analysis.  *Dukes*, 564 U.S. at 359.  While Rule 23(a)(2) can be satisfied by even a single question, Rule 23(b)(3) requires convincing proof that common questions "predominate" over individual questions.   *Amchem*, 521 U.S. at 623–24.  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson*

20

1    *Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting W. Rubenstein, *Newberg on Class*

2    *Actions* § 4:50, pp. 196–197 (5th ed. 2012)).  "When common questions present a significant

3    aspect of the case and can be resolved for all members of the class in a single adjudication, there

4    is clear justification for handling the dispute on a representative rather than on an individual

5    basis."  *Hanlon*, 150 F.3d at 1022.

6         As discussed above, plaintiff challenges defendant's "uniform" policies, which have

7    allegedly deprived Class Members of statutorily required meal and rest periods and compensation

8    for hours worked.  (Doc. Nos. 45-1 at 24; 45-2 at 4–5.)  Plaintiff maintains that "answers to [the]

9    common questions will resolve Defendant's alleged liability to Class Members except with

10   respect to the amounts of damages to be awarded, which may largely be calculated by reference

11   to Defendant's policies and records."  (Doc. No. 45-1 at 27.)

12        Class actions in which a defendant's uniform policies are challenged generally satisfy the

13   predominance requirement of Rule 23(b)(3).  *See, e.g.*, *Castro*, 2020 WL 1984240, at *6;

14   *Palacios v. Penny Newman Grain, Inc.*, No. 1:14-cv-01804-KJM-SAB, 2015 WL 4078135,

15   at *5–6 (E.D. Cal. July 6, 2015); *see also Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d

16   1150, 1154–1155 (9th Cir. 2016) (upholding predominance determination in wage and hour suit

17   despite the need for individualized damages calculations).  The court therefore concludes that the

18   predominance requirement has been met in this case.

19              b.    *Superiority*

20        Rule 23(b)(3) also requires a court to find that "a class action is superior to other available

21   methods for the fair adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  To resolve the

22   Rule 23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing

23   separate actions individually, any litigation already in progress involving the same controversy,

24   the desirability of concentrating in one forum, and potential difficulties in managing the class

25   action—although the last two considerations are not relevant in the settlement context."  *See*

26   *Palacios*, 2015 WL 4078135, at *6 (citing *Schiller v. David's Bridal Inc.*, No. 10-cv-00616-AWI-

27   SKO, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012)).

28   /////

1    Here, plaintiff asserts that the superiority requirement is satisfied because most of the

2    Class Members "stand to recover damages in relatively small amounts." (Doc. No. 45-1 at 27.)

3    As a result, "a class action thus serves as the only method that would 'permit the plaintiffs to pool

4    claims which would be uneconomical to litigate individually.'" (*Id.* (quoting *Local Joint Exec.*

5    *Bd. Of Culinary/Bartenders Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir.

6    2001).)

7    Given that "[a] common nucleus of facts and potential legal remedies" predominate, the

8    court finds that these questions can be resolved for all members more efficiently and

9    expeditiously in a single action. *Hanlon*, 150 F.3d at 1022. Therefore, the court is satisfied at

10   this stage of the litigation that the superiority requirement has been met here.

11   **B.     Conditional Certification of FLSA Collective Action**

12   Plaintiffs seeking conditional certification of a collective action under the FLSA have the

13   burden to show that they are "similarly situated" to other employee class members. *Nen Thio*, 14

14   F. Supp. 3d at 1340. Plaintiffs can show they are "similarly situated by making substantial

15   allegations, supported by declarations or discovery, that the putative class members were together

16   the victims of a single decision, policy, or plan." *Rodriguez v. Danell Custom Harvesting, LLC*,

17   293 F. Supp. 3d 1117, 1130 (E.D. Cal. 2018) (quoting *Nen Thio*, 14 F. Supp. 3d at 1340) (internal

18   quotation marks omitted). Courts are to apply a lenient standard when determining whether to

19   conditionally certify a collective. *See Syed v. M-I, L.L.C.*, No. 1:12-cv-01718-AWI-MJS, 2014

20   WL 6685966, at *2 (E.D. Cal. Nov. 26, 2014). Here, the proposed FLSA collective consists of all

21   current and former California hourly, non-exempt employees who were employed by defendant

22   during the Class Period.[14] (Doc. No. 45-2 at 37.)

23   For all the reasons the court has found the Class satisfies the requirements for preliminary

24   certification under Rule 23, the proposed FLSA collective is also found to satisfy the FLSA's less

25   stringent requirement that the members be "similarly situated." Conditional certification of the

26   FLSA Collective is therefore found to be appropriate.

27   _____

28   [14]  As noted previously, plaintiff does not in his motion specify the definition of the FLSA
     Collective. Plaintiff is directed to so specify in the motion for final approval.

**C.     Preliminary Settlement Approval**

Plaintiff also seeks preliminary approval of the settlement.  Under Rule 23(e), a court may approve a class action settlement only if it is a fair, reasonable, and adequate resolution of the dispute.  *Bluetooth*, 654 F.3d at 946.  "[P]reliminary approval of a settlement has both a procedural and substantive component."  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (citation omitted).  In particular, preliminary approval of a settlement and notice to the proposed class is appropriate if:  (1) the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; and (2) the settlement falls within the range of possible approval, has no obvious deficiencies, and does not improperly grant preferential treatment to class representatives or segments of the class.  *Id.*

Because the proposed settlement also has PAGA and FLSA components, the settlement must also meet certain requirements under those acts.  The court will first address in turn whether these requirements have been met.

1.     The PAGA Component

PAGA requires that a proposed settlement be submitted to the LWDA.  Cal. Lab. Code at § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (noting that a proposed settlement should be submitted to the LWDA to allow it to comment if it so desires (citing *Ramirez v. Benito Valley Farms, LLC*, No. 16-cv-04708-LHK, 2017 WL 3670794, at *2 (N.D. Cal. Aug. 25, 2017))).

Here, plaintiff's counsel has declared that the proposed settlement was submitted to the LWDA, and in support of this contention, has attached a copy of a LWDA file upload page and confirmation email reflecting that a proposed settlement was submitted to the LWDA on January 6, 2021.  (Doc. No. 45-2 at 32–33, 291–294.)  To date, LWDA has not commented on the settlement.  The court will address the fairness, reasonableness, and adequacy of the PAGA penalties below.

2.     The FLSA Component

In moving for preliminary approval, plaintiff does not explicitly state that there is a *bona fide* dispute regarding whether defendant complied with the FLSA's minimum wage and overtime

compensation requirements.  However, such a dispute is apparent from the face of plaintiff's pending motion.  Plaintiff asserts that defendant violated the FLSA by failing to pay minimum and overtime wages.  (Doc. No. 45-1 at 13.)  On the other hand, defendant "denies and continues to deny each and every material factual allegation and all Claims."  (Doc. No. 45-2 at 62.)  Indeed, "[i]t is Defendant's position that it has properly compensated and reimbursed all of its hourly employees."  (Doc. No. 45-2 at 198.)

Because the court is satisfied that a *bona fide* dispute exists in this case, it will also evaluate the fairness of the proposed settlement of the FLSA claims.  *See McKeen-Chaplin v. Franklin Am. Mortg. Co.*, No. 10-cv-5243-SBA, 2012 WL 6629608, at *2 (N.D. Cal. Dec. 19, 2012) (finding a *bona fide* dispute in part because of disputes over the proper measure of damages and the amount of overtime hours that the plaintiffs actually worked); *Nen Thio*, 14 F. Supp. 3d at 1340 (noting that a *bona fide* dispute can exist over issues such as the "computation of back wage") (quoting *Yue Zhou v. Wang's Rest.*, No. 05-cv-0279-PVT, 2007 WL 2298046, at *1 (N.D. Cal. Aug. 8, 2007)).

### 3.   Procedural Fairness

Having addressed whether the applicable PAGA and FLSA requirements have been met, the court must next consider whether the process by which the parties arrived at the settlement is the product of arm's-length bargaining, rather than collusion or fraud.  *See Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  A settlement is presumed to be fair if it "follow[s] sufficient discovery and genuine arm[']s-length negotiation."  *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (citation omitted).  In addition, the parties' participation in mediation "tends to support the conclusion that the settlement process was not collusive."  *Palacios*, 2015 WL 4078135, at *8 (citation omitted).

Here, as indicated above, the parties entered into private mediation before the Honorable Steven M. Vartabedian, an experienced professional mediator, on November 6, 2019.  (Doc. No. 45-1 at 14.)  Prior to and during mediation, the parties engaged in "informal discovery," whereby they exchanged "substantial" amounts of "data, information and documents," including the production of defendant's "financial records, . . . time-keeping records, [and] time and payroll

1  data for putative class members." (*Id.* at 14, 31.)  The mediation took place after approximately

2  ten months of litigation, and plaintiff's counsel prepared a damages calculations in advance of the

3  mediation to determine the potential value of plaintiff's claims.  (*Id.* at 32.)  Upon providing its

4  financial information during mediation, defendant "represented that it was not in the financial

5  position to pay out anywhere near what Plaintiff believed the case was worth."  (Doc. No. 45-5 at

6  ¶ 4.)  According to defendant, "[t]he mediator was able to negotiate a settlement with a payment

7  plan with the parties," and "[w]ithout a settlement payment plan . . . no settlement would have

8  been reached." (*Id.* at ¶¶ 5–6.)  In sum, plaintiff and his counsel assert that the settlement was

9  reached only after "extensive arms-length negotiations."  (Doc. No. 45-1 at 31.)

10         Based on these representations by the parties, the court preliminarily concludes that the

11  parties' negotiation constituted genuine, informed, and arm's-length bargaining.

12         4.    <u>Substantive Fairness</u>

13               a.    *Adequacy of the Settlement Amount*

14         In evaluating the fairness of a settlement award, "the settlement's benefits must be

15  considered by comparison to what the class actually gave up by settling."    *Campbell v.*

16  *Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citing *Protective Comm. for Indep.*

17  *Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to

18  [the] process [of evaluating settlements] . . . is the need to compare the terms of the compromise

19  with the likely rewards of litigation.").  However, "[i]t is well-settled law that a cash settlement

20  amounting to only a fraction of the potential recovery does not *per se* render the settlement

21  inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as*

22  *amended* (June 19, 2000) (citation omitted).  To determine whether a settlement "falls within the

23  range of possible approval," a court must focus on "substantive fairness and adequacy" and

24  "consider plaintiffs' expected recovery balanced against the value of the settlement offer."

25  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

26         The parties in this case have agreed to a $175,000 Gross Settlement Fund.  (Doc. No. 45-2

27  at 40.)  Assuming the various allocations described earlier in this order are awarded in full, the

28  Net Settlement Fund would be worth approximately $83,666.  (*Id.*)  Of that, 90% is allocated to

the Net Class Settlement, and the remaining 10% to the Net FLSA Settlement Fund.  (Doc. No. 45-2 at 55.)  The entire Net Settlement Fund will be distributed to the Participating Class and FLSA Members on a *pro rata* and non-reversionary basis, with any uncashed funds to be donated to California State Controller's Unclaimed Property Fund.  (*Id.* at 47, 57.)

Plaintiff estimates that the maximum potential damages as to plaintiff's claims are approximately $3.7 million.[15]  (Doc. No. 45-1 at 34.)  Without including the estimated value of the PAGA claims, the Gross Settlement Fund of $175,000 is only an approximately 5.8 percent recovery of plaintiff's maximum potential damages.  (*Id.*)  *See also Singh v. Roadrunner Intermodal Servs, LLC*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 2412325, at *7 (E.D. Cal. May 29, 2018), *modified*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018) (excluding the estimated value of the plaintiffs' PAGA claims when calculating the percentage of the estimated maximum damages accounted for by the proposed settlement amount).  In addition, the recovery here is allocated such that employees will receive payouts that scale directly with the number of pay period they worked.  (Doc. No. 45-1 at 17.)

The proposed settlement amount is, for the most part, below the general range of percentage recoveries that California courts—including this one—have found to be reasonable.  *See, e.g. Singh*, 2018 WL 2412325, at *7 (approving a settlement of about 12% of the estimated maximum damages); *Glass v. UBS Fin. Servs., Inc.*, No. 3:06-cv-04068-MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (approving a settlement of about 25–35% of the estimated maximum); *Hunt v. VEP Healthcare, Inc.*, No. 16-cv-04790-vc, 2017 WL 3608297, at *1 (N.D. Cal. Aug. 22, 2017) (denying preliminary approval of a class action settlement where the proposed settlement amounted to only 4.3 percent of the estimated damages); *but see Ferrell v. Buckingham Property Management*, No. 1:19-cv-00332-NONE-SAB, 2020 WL 4364647, at *2 (E.D. Cal. July 30, 2020) (granting preliminary approval of a class action settlement that

---

[15]  It is unclear from the face of plaintiff's pending motion whether the valuation of plaintiff's FLSA overtime and minimum wage claims included the liquidated damages provided for by law. *See* 29 U.S.C. § 216(b).  In plaintiff's motion for final approval of the class and collective action settlement, plaintiff's counsel is directed to clarify whether liquidated damages under the applicable statute were included in the $3.7 million estimate.

amounted to 5.3 percent of the estimated damages and noting that "[t]he proposed settlement amount is somewhat near the range of the percentage recoveries that district courts have found to be reasonable"); *Balderas v. Massage Envy Franchising, LLC*, No. 12-cv-06327-NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (granting preliminary approval of class action settlement where the proposed settlement amounted to 5% of the total value of the claims, based on the risks and expenses of continued litigation, but requiring the parties to present evidence as to why such a low recovery was warranted in that case).

Plaintiff argues that the proposed settlement's recovery rate and *pro rata* allocation method is accurate and fair for several reasons. (Doc. No. 45-1 at 34–39.) First, plaintiff asserts that "[t]here is a substantial risk that the Court could reduce civil penalties to an insignificant amount if it is unpersuaded by Plaintiff's evidence that Defendant intentionally violated the law. . . . The Court could also award no civil penalties." (*Id.* at 34.) Plaintiff also asserts that there is a risk that plaintiff will not prevail on several of his claims due to the difficulty of proving many of those claims. (*Id.* at 35.) For example, according to plaintiff, if the case were to proceed to trial, defendant would plan to produce witnesses who would deny that defendant had a policy requiring employees to clock-out prior to the completion of their work. (*Id.*) Similarly, plaintiff's counsel states that "[i]n meal period claims, there always exists the difficulty of proving why a class member took a short, late, or no meal period," and as to rest periods, "there is no . . . evidence to prove a missed rest period or that the employer refused to authorize and permit one." (*Id.* at 35– 36.) Plaintiff likewise discounted the settlement award due to his representation that plaintiff's counsel "will encounter difficulties computing mileage expenses based on the absence of records of which employee drove company vehicles on which days." (*Id.* at 37.) Plaintiff also points to other risks of further litigation, such as that this court may strike the PAGA claims as unmanageable, particularly in light of the "difficulties that arise from gathering employee testimony . . . to prov[e] companywide violations." (*Id.* at 37–38.)

/////

/////

/////

Moreover, plaintiff points to the costs of litigation and defendant's financial condition as further justification for the proposed settlement amount. *Id.* at 21. According to plaintiff:

> Defendant's financial condition is the primary reason Plaintiff's counsel recommended Plaintiff accept the Settlement on behalf of the Class. Defendant presented tax returns for 2016 through 2018 which showed Defendant operating at a loss in 2016 and 2018 and earning only a meager profit in 2017. Defendant convincingly promised to seek bankruptcy protection and shut down the business if the litigation continued. Defendant states that its assets only include vehicles (with little or negative equity), bobcats, utility work machines, tools, and office equipment—all items of low-value. Neither the Defendant nor Robert Salas (sole shareholder of the Defendant) owns any real property or any significant cash reserves. Mr. Salas is a sixty-five (65) year old man who is contemplating retirement . . . . He does not own a home and leases his residence and his only major asset is his pick-up truck which has only minimal value. Due to Defendant's financial condition, even if Plaintiff prevailed on all claims at trial, he may never recover the unpaid wages and penalties due to the risk of Defendant's insolvency. A very large class action judgment would certainly put the Defendant out of business. . . . If the company ceases to exist, the putative class members will have no hope of recovery.

(*Id.* at 31–32) (internal citations omitted). To that end, plaintiff's counsel avers that, due to defendant's precarious financial condition,

> continued litigation presents significant risks of a downward departure from my estimate of Defendant's wage and penalties exposure. In view of the risks, the Settlement reflects my estimate of the total amount of wages and penalties that the Plaintiff and putative class members could reasonably expect the Court to award them at trial, taking into account the likelihood of prevailing and other attendant risks.

(Doc. No. 45-2 at 20.) Thus, plaintiff's counsel describes the settlement amount as a "fair, adequate, and reasonable compromise" for the claims brought by plaintiff. (*Id.*)

The court also observes that because there are only 39–40 Class Members, the amount that the average Class and FLSA Member can expect to receive under the proposed settlement is $2,145.30. (Doc. No. 45-2 at 41.) This average amount is significant given Class Members' estimated average hourly pay of $19.17. (Doc. No. 45-2 at 32, 206); *see Gonzalez v. CoreCivic of Tenn., LLC*, No. 1:16-cv-01891-DAD-JLT, 2020 WL 1475991, at *11 (E.D. Cal. Mar. 26, 2020) (noting that an average settlement award of $3,000.00 is significant for employees who typically earn $15.00–30.00 an hour).

28

While "a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'" *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)).  For all of these reasons, and particularly in light of defendant's precarious financial condition that apparently places the allegedly aggrieved workers' ability to recover damages at risk, the court will preliminarily approve the settlement amount reflected in the proposed settlement.

> b.     *PAGA Penalties*

The settlement also provides for $4,000.00 in civil PAGA penalties.  (Doc. No. 45-1 at 15.)  Pursuant to the PAGA, 75% of the civil penalties, or $3,000, will go to the LWDA, and 25%, or $1,000, will remain as part of the Net Class Settlement Fund.  (*Id.*)  *See* Cal. Lab. Code § 2699(i).

Plaintiff's counsel initially estimated $729,000.00 in potential PAGA exposure.  (*See* Doc No. 45-2 at 33–34, 213.)  After applying the generalized discounts described above, the value of the PAGA claims was further discounted due to the "substantial risk that the Court could reduce civil penalties to an insignificant amount" or "award no civil penalties" at all, citing a state court case in which an appellate court affirmed the trial court's grant of only 10% of the potential PAGA penalties.  (Doc. No. 45-1 at 34); *Carrington v. Starbucks*, 30 Cal. App. 5th 504, 529 (2018).  Plaintiff asserts that the parties "negotiated a good faith amount for PAGA penalties" and that the portion to be paid to the LWDA was "not the result of self-interest at the expense of other Class Members."  (Doc. No. 45-1. at 38.)   In addition, plaintiff's counsel represents that they "dramatically discount[ed]" the value of the PAGA penalties due to the "great difficulties" involved in proving that defendant's violations were knowing, intentional, or willful.  (*Id.* at 34.)

The resulting $4,000.00 allocated toward civil penalties represents approximately 2.3% of the Gross Settlement Fund.  The amount proposed to settle plaintiff's PAGA claims is consistent with other PAGA settlements approved by this court.  *See, e.g.*, *Castro*, 2020 WL 1984240, at *15 (approving PAGA penalties representing 2% of the gross settlement fund); *Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving

PAGA penalties representing 2.5% of the gross settlement fund).  The court therefore concludes preliminarily that the settlement of plaintiff's PAGA claims is fair, reasonable, and adequate considering PAGA's public policy goals.  *See O'Connor*, 201 F. Supp. 3d at 1133.

c.    *Attorneys' Fees*

When a negotiated class action settlement includes an award of attorneys' fees, the district court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."[16]  *Bluetooth*, 654 F.3d at 941; *see also Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted).  Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial."  *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (citation omitted).  As a result, the district court must assume a fiduciary role for the class members and "act with 'a jealous regard to the rights of those who are interested in the fund' in determining what a proper fee award is."  *Id.* (internal quotation marks and citations omitted).

In evaluating the award of attorneys' fees, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method."  *Bluetooth*, 654 F.3d at 942 (citations omitted).  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion."  *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a percentage of the common fund recovered for the class; in the Ninth Circuit, the benchmark is 25%.  *Id.* at 1007, 1047–48; *see also Bluetooth*, 654 F.3d at 942.  Special circumstances that may justify varying the benchmark award include when counsel achieves exceptional results for the class, undertakes extremely risky litigation, generates benefits for the class beyond simply the cash

---

[16]  This requirement also flows from the court's obligation to review and approve any FLSA settlements.  *See Kerzich v. Cnty. of Tuolumne*, No. 1:16-cv-01116-DAD-SAB, 2019 WL 1755496, at *2 (E.D. Cal. Apr. 19, 2019) (listing cases).

1    settlement fund, or handles the case on a contingency basis.  *See In re Online DVD-Rental*

2    *Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015).  An explanation is necessary when the

3    court departs from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir.

4    2000), but either way, "[s]election of the benchmark or any other rate must be supported by

5    findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*,

6    290 F.3d 1043, 1048 (9th Cir. 2002).

7         With the lodestar method, the court multiples the number of hours the prevailing party

8    reasonably spent litigating the case by a reasonable hourly rate for counsel.  *Bluetooth*, 654 F.3d

9    at 941.  The product of this computation, the "lodestar" amount, yields a presumptively

10   reasonable fee.  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

11        The Ninth Circuit has recommended that district courts apply one method but cross-check

12   the appropriateness of the determined amount by employing the other as well.  *See Bluetooth*, 654

13   F.3d at 944.  This diligence is particularly important "when counting *all* hours expended" in a

14   case "where the plaintiff has achieved only limited success" would yield an "excessive amount"

15   of fees, or when awarding a percentage of a "megafund would yield windfall profits for class

16   counsel in light of the hours spent on the case." *Bluetooth*, 654 F.3d at 942 ("Just as the lodestar

17   method can confirm that a percentage of recovery amount does not award counsel an exorbitant

18   hourly rate, the percentage-of-recovery method can likewise be used to assure that counsel's fee

19   does not dwarf class recovery.") (internal quotation marks and citations omitted).  Similarly, an

20   upward adjustment could be justified if the recovery is "too small . . . in light of the hours devoted

21   to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904

22   F.2d 1301, 1311 (9th Cir. 1990).

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1        Here, the settlement provides that class counsel will seek an award of 33.33% of the Gross

2   Settlement Fund, equivalent to $58,333.00. [17]  (Doc. No. 45-1 at 20, 41.)  This amount is higher

3   than the 25% benchmark for the Ninth Circuit, *Bluetooth*, 654 F.3d at 942, but not uncommon for

4   wage-and-hour class actions such as this in the Eastern District of California.  *Barbosa v. Cargill*

5   *Meat Sols. Corp.*, 297 F.R.D. 431, 450 (E.D. Cal. 2013) (listing cases where courts approved

6   attorneys' fees of about one-third of the total settlement).  Plaintiff's counsel asserts that this

7   award is appropriate considering time and effort expended by counsel, the contingency fee basis

8   of the representation and counsel's experience in litigating wage and hour class actions, which

9   plaintiff's counsel describes as having been "integral" to developing the proposed settlement.

10  (Doc. No. 45-1 at 42, 44.)  In addition, plaintiff's counsel contends that the requested attorneys'

11  fees are justified under application of the lodestar method.  (*Id.* at 43.)  Plaintiff's counsel

12  represents that they have expended a combined total of 199.17 hours on the representation in this

13  case thus far and has provided hourly rates ranging from $150.00 for legal assistants to $700.00

14  for an attorney with 25 years of experience.  (Doc. Nos. 45-2 at 24–25; 45-3 at ¶ 7.)  Using these

15  /////

16  /////

17

18  [17]  The settlement also provides for up to $15,000 in litigation costs.  (Doc. No. 45-2 at 49.)
    Plaintiff submitted a list of litigation expenses incurred by plaintiff's counsel's thus far, as well as

19  expected costs through the final accounting of this settlement.  (*Id.* at 230–31.)  As of December
    31, 2020, plaintiff's counsel had incurred $5,056.51 in litigation expenses and estimates that at

20  the conclusion of this settlement, such costs will be approximately $5,335.53.  (*Id.* at 21, 231.)
    The documented expenses include mediation fees and expenses, court filing fees, legal research

21  expenses, and postage expenses.  These costs appear to be reasonable and necessary.  *See In re*
    *Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) ("[A]n award of

22  expenses should be limited to the typical out-of-pocket expenses that are charged to a fee paying
    client and should be reasonable and necessary").  Given plaintiff's counsel's estimates and the

23  additional requests the court has made of the parties in this order, the court finds that documented
    litigation costs of up to $7,500 would be fair, reasonable, and adequate for the purposes of

24  preliminary approval.  *See, e.g.*, *Alberto v. GMRI, Inc.*, No. 2:07-cv-01895-WBS-DAD, 252
    F.R.D. 652, 665 (E.D. Cal. 2008) (granting preliminary approval of a class action settlement in

25  which $10,000 of the $435,000 settlement fund would be allocated to documented litigation costs,
    but requiring class counsel to submit an application for reimbursement of costs).  Nonetheless, the

26  parties are directed to provide an accounting for the requested $15,000 in litigation costs in

27  seeking final approval.  At that time, the court will carefully re-examine the amount of litigation

28  costs to be awarded as part of the settlement.

1   hourly rates yields a preliminary lodestar calculation of approximately $81,471.00.  (Doc. No.

2   45-1 at 44.)  The proposed attorneys' fees are, according to plaintiff's counsel, thus well-within

3   the lodestar.

4        For the purposes of preliminary approval only, the court is satisfied by the justifications

5   provided by plaintiff's counsel for a departure from the 25% benchmark.  The court will,

6   however, at the final approval stage, carefully re-examine the award of attorneys' fees and

7   conduct a final lodestar cross-check, particularly in light of the rather low recovery rate under the

8   proposed settlement to be received by the workers making up the class and collective.

9            d.    *Incentive Payment*

10       While incentive awards are "fairly typical in class action cases," they are discretionary

11  sums awarded by the court "to compensate class representatives for work done on behalf of the

12  class, to make up for financial or reputational risk undertaken in bringing the action, and,

13  sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez v. W.*

14  *Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *see also Staton v. Boeing Co.*, 327 F.3d 938,

15  977 (9th Cir. 2003) ("[N]amed plaintiffs . . . are eligible for reasonable incentive payments.").

16  Such payments are to be evaluated individually, and the court should look to factors such as "the

17  actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

18  benefitted from those actions . . . the amount of time and effort the plaintiff expended in pursuing

19  the litigation . . . and reasonabl[e] fear[s of] workplace retaliation."  *Staton*, 327 F.3d at 977

20  (citation omitted).

21       Here, plaintiff Cavazos has requested an incentive payment of $10,000.00.  (Doc. No. 45-

22  1 at 46.)  In this regard, according to plaintiff's pending motion,

23           Plaintiff has devoted multiple hours of time advancing the interests
             of the Class Members . . . by, among other things, retaining
24           experienced counsel, providing them with extensive information
             about his work history with Defendant and Defendant's policies and
25           practices with respect to the wage and hour claims at issue,
             meaningfully participating in the mediation and subsequent
26           negotiations that led to the Settlement to ensure a fair result for the
             Class Members as a whole.
27

28  (Doc. No. 45-1 at 46.)  Plaintiff also contends that an incentive award in the requested amount is

                                            33

1    justified because plaintiff agreed to undertake "heavy fiduciary responsibilities" as class

2    representative and exposed himself to "significant risks," such as the risk that he could be ordered

3    to pay defendant's attorneys' fees and costs if the action had been unsuccessful or that he could

4    be subject to "worsened career prospects" in the future due to bringing a lawsuit against a prior

5    employer.  (*Id.* at 45–48.)  Plaintiff also contends that under the *pro rata* distribution method of

6    the Gross Settlement Fund, his individual share of the Net Settlement Fund will likely be "only a

7    few hundred dollars," considerably less than that of some absent Class Members who worked for

8    defendant for longer periods of time.  (*Id.* at 48–49; Doc. No. 45-4 at 3.)  Moreover, plaintiff's

9    counsel avers that plaintiff "achieved a phenomenal result" for the Class Members in light of the

10   risks involved in bringing this case.  (Doc. No. 45-2 at 31.)  Plaintiff's counsel notes that plaintiff

11   provided counsel with "detailed descriptions of how defendant's business operates, the hours and

12   scheduling of employees, and the nature of the work Class Members performed."  (*Id.*)

13   According to plaintiff's declaration, he has spent 33.43 hours of his time in connection with this

14   litigation as of the filing of the instant motion.  (Doc. No. 45-4 at 3–4.)

15          Plaintiff's incentive payment would be in addition to his individual settlement payment.

16   (*See* Doc. No. 45-4 at 3.)  Under the proposed settlement, the average putative class member will

17   receive $2,145.30.  (Doc. No. 45-2 at 41.)  Thus, an incentive award of $10,000 would be roughly

18   five times the average amount each Class Member could expect to receive from the proposed

19   settlement.  Though this figure is not necessarily excessive, *see, e.g.*, *Aguilar v. Wawona Frozen*

20   *Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017)

21   (approving an incentive award of $7,500 to each class representative where average class

22   recovery was approximately $500), the Ninth Circuit has repeatedly urged district courts to be

23   "vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of

24   the class representatives."  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir.

25   2013) (citation omitted); *see also In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934 (9th

26   Cir. 2015) (upholding the district court's determination that awarding $5,000 each to nine class

27   representatives was appropriate even though objectors argued it was significantly larger than the

28   $12 each unnamed class member would receive).

1    Having reviewed the proposed $10,000.00 incentive award, the court notes that the

2    amount requested may be disproportionately high given the possible disparity with the proposed

3    settlement's average or median award.[18]  Although the court will preliminarily approve the

4    incentive award in the amount sought, plaintiff must demonstrate at the final approval stage that

5    the requested awards are commensurate with and do not inappropriately dwarf the awards

6    received by the putative class members.

7                    e.    *Release of Claims*

8        All Class Members who do not timely opt out of the settlement will be deemed to have

9    released defendant from the Released Class Claims.  (Doc. No. 45-1 at 17.)  However, only FLSA

10   Members who affirmatively opt-in to the FLSA Settlement will release defendant from the

11   Released FLSA Claims.[19]  (*Id.* at 18.)  Altogether, these released claims arguably track plaintiff's

12   claim in this action and the settlement does not appear to release unrelated claims that Class

13   Members may have against defendant.[20]  Cf. *Bond v. Ferguson Enter., Inc.*, No. 1:09-cv-01662-

14   OWW-MJS, 2011 WL 284962, at *7 (E.D. Cal. Jan. 25, 2011) ("This form of release is

15   overbroad by arguably releasing all unrelated claims up to the date of the Agreement.").

16   **D.    Proposed Class Notice and Administration**

17       For proposed settlements under Rule 23, "the court must direct notice in a reasonable

18   manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1); *see*

19

20   [18] Plaintiff's counsel has provided the court with the average award expected from the settlement,
     but has not provided estimates regarding the expected median, minimum, or maximum awards.
21   Plaintiff is directed to provide this information in his motion for final approval of the class and
22   collective action settlement.

23   [19] As noted previously, FLSA Members opt-in to the FLSA Settlement by writing the following
     on the bottom of their FLSA Settlement Checks:  "By signing, endorsing, depositing, cashing,
24   and/or negotiating this check, I hereby 'opt in' to the Settlement and release all claims pursuant to
     the Fair Labor Standards Act, 29 U.S.C. § 216(b) *et seq.*"  (Doc. No. 45-1 at 18.)
25

26   [20] Although the court grants preliminary approval of this class action settlement, the court does
     express its serious concern regarding the release of "concealed or hidden" claims as specified in
27   the Settlement Agreement.  (Doc. No. 45-2 at 41.)  The parties are hereby directed to address this
     language at the final approval hearing and to be prepared to demonstrate to the court that the
28   release of claims, in this respect, is not overbroad.

1   *also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement

2   under Rule 23(e)."). For a class certified under Federal Rule of Civil Procedure 23(b)(3), the

3   notice must contain, in plain and clear language: (1) the nature of the action; (2) the definition of

4   the class certified; (3) the class claims, issues, or defenses; (4) the right of a class member to

5   appear through an attorney, if desired; (5) the right to be excluded from the settlement; (6) the

6   time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on

7   members of the class. Fed. R. Civ. P. 23(c)(2)(B).

8       A class action settlement notice "is satisfactory if it generally describes the terms of the

9   settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

10  forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)

11  (internal quotation marks and citations omitted).

12      For proposed settlements under the FLSA, "the court [must] provide potential plaintiffs

13  'accurate and timely notice concerning the pendency of the collective action, so that they can

14  make informed decisions about whether or not to participate.'" *Adams v. Inter–Con Sec. Sys.*,

15  242 F.R.D. 530, 539 (N.D. Cal. 2007) (quoting *Hoffmann–La Roche v. Sperling*, 493 U.S. 165,

16  170 (1989)); *see generally* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any

17  such action unless he gives his consent in writing to become such a party and such consent is filed

18  in the court in which such action is brought.").

19      In addition, "courts considering approval of settlements in these hybrid [Rule 23 and

20  FLSA] actions consistently require class notice forms to explain: '(1) the hybrid nature of th[e]

21  action; [] (2) the claims involved in th[e] action; (3) the options that are available to California

22  Class members in connection with the settlement, including how to participate or not participate

23  in the Rule 23 class action and the FLSA collection action aspects of the settlement; and (4) the

24  consequences of opting-in to the FLSA collective action, opting-out of the Rule 23 class action,

25  or doing nothing.'" *Thompson v. Costco Wholesale Corp.*, No. 14-cv-2778-CAB-WVG, 2017

26  WL 697895, at *8 (S.D. Cal. Feb. 22, 2017) (quoting *Pierce v. Rosetta Stone, Ltd.*, No. 4:11-cv-

27  01283-SBA, 2013 WL 1878918, at *4 (N.D. Cal. May 3, 2013)).

28  /////

Here, the settlement provides that the Settlement Administrator will receive a list identifying each Class Member and FLSA Collective Member, culled from defendant's business records. (Doc. No. 45-2 at 51–52.)  The Settlement Administrator will then send a Notice Packet to each of those Class Members, in both English and Spanish via first-class mail.  (*Id.* at 52, 54.) The Settlement Administrator will then re-mail[21] any Notice Packets that are returned to the Settlement Administrator within twenty-eight (28) days of having been initially mailed and will process any Requests for Exclusion, Pay Periods Disputes, and Notices of Objections.  (*Id.* at 51, 53, 57.)  On a weekly basis, the Settlement Administrator must send class counsel and plaintiff's counsel updates regarding the number of opt-out requests and objections to the settlement.  (*Id.* at 51.)  The Settlement Administrator will also provide class counsel with proof of mailing the Notice Packet, which class counsel will file with the court no later than seven (7) days prior to the final approval hearing.  (*Id.* at 51.)

The Notice Packet includes a single Notice of Class Action Settlement that describes both the class action settlement and the FLSA settlement.  (Doc. No. 45-2 at 69–72.)  The Notice of Class Action Settlement explains that Participating Class and FLSA Members will receive two checks: (1) a class action settlement check comprising 90% of the individual's pro-rated payment amount; and (2) an FLSA Settlement Check comprising 10% of the individual's pro-rated payment amount.  (Doc. No. 45-2 at 71.)  The Notice Packet also includes procedures for Class Members to opt-out of the class action settlement and for FLSA members to opt-into the collective action settlement.  (*Id.* at 71, 76.)  Importantly, the Notice Packet also explains—in bold text—that Class and FLSA members will not receive their individual payment amounts until approximately 39 months after this court approves the settlement.  (*Id.* at 71.)  Accordingly, the Notice Packet states that "[i]t is important that you advise the Settlement Administrator of any

---

[21]  In their proposed preliminary approval order, the parties specify if that the Settlement Administrator will perform one of two methods of skip-tracing (a search of the NCOA database and/or a search through Experian) to identify the most accurate address of the intended recipient. (Doc. No. 45-2 at 87–88.)  However, the parties do not reference the skip-tracing procedure in the Settlement Agreement itself.  The parties are directed to demonstrate to the court at the final approval hearing that the above-described skip-tracing procedure was followed with respect to any returned Notice Packets.

1   changes to your address during the time period after the Court approves the Settlement." (*Id.*)

2   The Notice Packet does not reference or describe the "Defendant's Right to Void Settlement"

3   section of the Settlement Agreement, under which defendant retains the exclusive right to void

4   the settlement if more than twenty (20%) of the Class Members timely submit opt-out requests.[22]

5   (*See* Doc. No. 45-2 at 58.)

6          According to plaintiff, the Notice Packet meets the requirements of Rule 23 by including

7   the following information:

> (1) what the Settlement is about; (2) who is a Class Member; (3) how
> Class Counsel will be paid; (4) how to submit an exclusion request
> not to be bound by the Settlement; (5) how to object to the
> Settlement; (6) how the Settlement will be allocated; (7) how
> payments to Class Members will be calculated; and (8) how the
> disputes will be resolved.

12   (Doc. No. 45-1 at 52.)

13         The court preliminarily finds that the notice and manner of notice proposed by plaintiff

14   meet the requirements of Federal Civil Procedure Rule 23(c)(2)(B) and 29 U.S.C. § 216(b) and

15   that the proposed mail delivery is appropriate under these circumstances.

16   /////

17   /////

18   /////

---

[22]   As mentioned above, the court previously expressed concern over this provision and directed the parties to provide authority for why the defendant's right to void settlement is reasonable, fair, and adequate under Rule 23. (Doc. No. 33 at 5–6.) In the instant motion, plaintiff asserts that this provision, known as a "blow up" clause, is common in class action settlements. (Doc. No. 45-1 at 45.) Plaintiff argues that the clause here is reasonable, fair, and adequate because defendants "routinely insist" upon the inclusion of blow up clauses because "the value of a class-wide settlement is considerably reduced if many plaintiffs opt out" and thus thwart the defendant's desired freedom from potential litigation. (*Id.*) In light of plaintiff's arguments, the parties' representations as to defendant's precarious financial condition, and relevant case law, the court preliminarily deems the provision here reasonable, fair, and adequate. *See Four In One Co., Inc. v. S.K. Foods, L.P.*, No. 2:08-cv-03017-KJM-JDP, 2014 WL 28808, at *8, *14 (E.D. Cal. Jan. 2, 2014) (granting preliminary approval of a settlement agreement involving a similar blow up clause with a 25% opt-out threshold); *Jones v. Canon Business Solutions, Inc.*, No. 2:12-cv-07195-JAK-JEM, 2014 WL 12272083, at *5, *16 (C.D. Cal. Sept. 2, 2014) (granting final approval of a settlement agreement involving a blow up clause with a 10% opt-out threshold for class members and a 32.5% opt-out threshold for FLSA class members).

**E.      Settlement Administrator and Settlement Administration Costs**

The parties have agreed to retain Simpluris, Inc. ("Simpluris") to handle the notice and claim administration process and request that Simpluris be appointed to serve as the Settlement Administrator.  (Doc. Nos. 45-1 at 51; 45-2 at 32.)

The estimated cost of administering this settlement is $3,499.00, and the parties have specified that administrative expenses shall not exceed $5,000.  (Doc. Nos. 45-2 at 32; 45-1 at 20.)  The cost of administering this settlement will be deducted from the Gross Settlement Fund. (Doc. No. 45-1 at 20.)  Plaintiff's counsel asserts that before agreeing to using Simpluris as Settlement Administrator, the parties also reviewed bids from CPT Group, Inc. and ILYM Group, Inc., which submitted bids of $8,500.00 and $4,582.47, respectively.  (Doc. No. 45-2 at 32.) Upon reviewing the bids from these third-party administrators, the court finds the administrative costs allocated here under the proposed settlement are fair and reasonable.

Accordingly, the court will appoint Simpluris as the Settlement Administrator.

**F.      Implementation Schedule**

Plaintiff has proposed an implementation schedule which may be summarized by the below table:

| Event | Date |
|---|---|
| Deadline for defendant to provide the Settlement Administrator and Class Counsel with an updated list of Class and FLSA Members ("Class List") | Fourteen (14) days after the date of service of entry of the Preliminary Approval Order |
| Deadline for the Settlement Administrator to send a Notice Packet to each Class and FLSA Member | Fourteen (14) days after receipt of the Class List |
| Deadline to file a Notice of Objection or Request for Exclusion | Forty-five (45) days after the initial mailing of the Notice Packet (the "Response Deadline") |
| Deadline to file a Request for Exclusion for re-mailed Notice Packets | Fourteen (14) days after the Response Deadline |
| Deadline for Settlement Administrator to issue checks to Class and FLSA Members | Fourteen (14) days after the defendant has deposited all funds with the Settlement Administrator; Twenty-eight (28) days after the defendant has deposited all funds with the Settlement Administrator |

39

| Deadline for recipients to cash Settlement Checks | One hundred eighty days (180) from the date it is mailed or re-mailed, whichever is later; if a check is not timely deposited, then thirty (30) days after the Settlement Administrator sends the claimant a warning letter advising them to cash the check within 30 days |
|---|---|
| Final Approval Hearing | At least ninety (90) days after preliminary approval is granted |

(*See* Doc. No. 45-1 at 19.)

However, the court makes the following adjustments to the parties' proposed implementation schedule. First, the court adds a deadline for the Settlement Administrator to send a cure letter to Class Members who submit a defective request for exclusion, which shall be three (3) days after a receipt of a defective request for exclusion. Second, the court adds a deadline for Class and FLSA members to file a Pay Periods Dispute, which shall be forty-five (45) days after the Response Deadline.[23] Third, the court adds a deadline for Class and FLSA Members to file a Notice of Objection or a Pay Periods Dispute for re-mailed Notice Packets, which shall be fourteen (14) days after the Response Deadline. Fourth, the court clarifies that the deadline for the Settlement Administrator to issue checks to Class and FLSA Members shall be fourteen (14) days after the defendant has deposited all funds with the Settlement Administrator. With these adjustments and modifications, the court will approve the parties' proposed implementation schedule.

## CONCLUSION

Accordingly:

1.    Plaintiff's motion for preliminary approval of class action settlement (Doc. No. 45-1) is granted;

2.    The proposed class identified in the settlement agreement (Doc. No. 45-2) is certified for settlement purposes;

/////

---

[23]  This deadline is consistent with the timeframe set forth in the Dispute Form included in the Notice Packet. (*See* Doc. No. 45-2 at 77.)

3. Plaintiff's counsel, David Spivak and Maralle Messrelian of The Spivak Law Firm and Walter Haines of United Employees Law Group, are appointed as class counsel for settlement purposes;

4. The named plaintiff, John Cavazos, is appointed as class representative for settlement purposes;

5. Simpluris is approved as the settlement claims administrator;

6. The proposed notice (Doc. No. 45-2 at 67–81) is approved in accordance with Federal Rule of Civil Procedure 23;

7. The proposed settlement detailed herein is approved on a preliminary basis as fair and adequate;

8. The hearing for final approval of the proposed settlement is set for May 23, 2022 at 1:30 p.m. before the undersigned in Courtroom 5, with the motion for final approval of class action settlement to be filed at least 28 days in advance of the final approval hearing, in accordance with Local Rule 230(b);

   a. Among other things the parties deem appropriate, the parties are directed to provide the court with the information requested in footnotes 3, 9, 14, 15, 17, 18, 20, and 21 in connection with plaintiff's motion for final approval of class action settlement; and

9. The settlement implementation schedule set forth above, as modified by the court, is adopted.

IT IS SO ORDERED.

Dated:   **February 18, 2022**

_____
UNITED STATES DISTRICT JUDGE